*Reversed and remanded.*

[Opinion delivered October 22, 1884.]

[No. 1678.]

ED. BEAN *v.* THE STATE.

1. MURDER — INDICTMENT.— It is not essential to the validity of an indictment for murder that it should allege that the killing was "unlawfully done;" nor that the defendant was "a person of sound memory and discretion;" nor that the deceased was "a reasonable creature in being." See the statement of the case for an indictment *held* sufficient to charge the offense of murder.

2. SAME — PRACTICE — CONFESSIONS.— Under the law of this State, the confession of an accused is admissible in evidence against him, when, in connection with his confession, he makes a statement of facts and circumstances found to be true, and which conduce to establish his guilt. By means of the statement of the accused in this case, the gun with which the murder was committed was found at the place where he said he had secreted it. *Held*, that the confession of the accused was properly admitted in evidence in behalf of the State.

3. SAME — JURY LAW.— In polling the jury after verdict, the defendant is entitled to no more than a categorical answer from each juror to the question: "Is that your verdict?" In this case the accused was charged as a principal. The verdict, affirmed by each juror on being polled, found him "guilty of murder in the first degree as charged in the indictment." The defense proposed to ask each juror if he intended to find the accused guilty as a principal or as an accomplice. *Held*, that the court properly refused to permit such examination of the jurors. See the opinion *in extenso* on the question.

4. SAME — CHALLENGE TO THE ARRAY.— Article 624 of the Code of Criminal Procedure enumerates the only grounds upon which a challenge to the array of jurors can be predicated. Moreover, it appears in this case that

the defense refused to accept the proposition of the district attorney to excuse the jurors summoned by the objectionable officer, and that he did not exhaust his peremptory challenges in the formation of the jury. *Held*, that, for such additional reasons, the trial court properly overruled the defendant's challenge to the array.

5. SAME — PRINCIPAL AND ACCOMPLICE.— EVIDENCE which shows an accused to be guilty as an accomplice to murder will not support his conviction as a principal.

6. SAME — PRINCIPAL OFFENDERS AND ACCOMPLICES DISTINGUISHED.— The distinction between a principal offender and an accomplice is stated as follows: The acts constituting an accomplice are auxiliary only, all of which may be and are performed by him anterior and as inducements to the crime about to be committed, whereas a principal offender not only may perform some antecedent act in furtherance of the commission of the crime, but, when it is actually committed, is doing his part of the work assigned him in connection with the plan and in furtherance of the common purpose, whether he be present where the main fact is to be accomplished, or not. When the offense is committed by the perpetration of different parts which constitute one entire whole, it is not necessary that the offenders should be in fact together at the perpetration of the offense to render them liable as principals. In other words, an accomplice, under our statute, is one who has completed his offense before the crime is actually committed, and whose liability attaches after its commission by virtue of his previous acts in bringing it about through the agency of or in connection with third parties. The principal offender acts his part individually, in furtherance of and during the consummation of the crime.

7. SAME — CHARGE OF THE COURT.— Otherwise stated the distinction is as follows: If the parties *acted together* in the *commission* of the offense they are principals. If they *agreed* to commit the offense together, but did not *act together* in its commission, the one who *actually* committed it is the principal, while the one who was not present at the commission, and who was not in any way aiding therein, as by keeping watch or by securing the safety or concealment of the principal, would be an accomplice. To constitute a principal the offender must either be present where the crime is committed, or he must do some act during the time when the offense is being committed which connects him with the acts of commission in some of the ways named in the statute. When the acts committed occur *prior* to the commission of the principal offense, or *subsequent* thereto, and are independent of and disconnected with the *actual commission* of the principal offense, and no act is done by the party during the commission of the principal offense in aid thereof, such party is not a principal offender, but is an accomplice or an accessory according to the facts. See the opinion *in extenso* for a charge of the court upon the subject *held* to be substantially in compliance with the law.

8. SAME.— See the opinion *in extenso* for a charge of the court when applying the law to the evidence, which, though correct as a legal proposition in so far as it grades the degree of the offense under circumstances stated, is nevertheless erroneous because it authorizes a conviction as a principal upon proof that would show guilt only as an accomplice. Note, also, the failure of the trial court to instruct the jury that if they believed from the evidence that the defendant was an accomplice in the murder, and not a principal in it, they could not convict him under the indictment which charged him only as a principal.

9. SAME.— See a state of case whereunder the trial court, in a murder case, erroneously refused a special charge, which recited a principle of law as follows: "You are further charged that the defendant being charged as a principal offender, he cannot, under the Code of this State, be convicted as an accomplice."

10. MURDER — INDICTMENT.— Note the opinion for a suggestion of this court to prosecuting attorneys as to the preparation of indictments in cases where the evidence may show one or the other of two or more offenses growing out of the same transaction.

APPEAL from the District Court of Gregg. Tried below before the Hon. A. J. BOOTY. (On exchange with the Hon. F. J. McCord.)

The indictment in this case charged the appellant, as a principal, with the murder of Charles Stevens, in Gregg county, Texas, on the 21st day of May, 1883. He was convicted, as such principal, of murder in the first degree, and was awarded the death penalty.

The charging part of the indictment, referred to in the first head-note of this report, reads as follows:

"  .  .  .   That one Ed. Bean, late of said county, on the twenty-first day of May, A. D. one thousand eight hundred and eighty-three, and in said county and State of Texas, did then and there, with malice aforethought, kill and murder one Charles Stevens, by then and there shooting him with a shot-gun, contrary to the law, and against the peace and dignity of the State."

Frank Johnson was the first witness for the State. He testified that on the Sunday evening preceding the death of Charley Stevens, he saw the defendant pass his house, coming from towards the Wilkins mill. The witness lived about three and a half miles west of Glade-water, on the Texas & Pacific Railway. The defendant, after shooting a bird near the witness's house, came up to the house and borrowed a gun wiper from the witness, with which he extracted the remaining load. He then reloaded the gun with what, from the rattling noise they made, the witness took to be mixed squirrel and buck shot. Witness did not see the shot. Defendant said that he had been to Longview, and that the train would not stop to let him off at Gladewater.

William Victory testified, for the State, that about 3 or 4 o'clock on Sunday evening — the evening preceding the death of Stevens — he saw the defendant near the Wilkins mill. He was then armed with a shot-gun, and was traveling down the railroad track towards Frank Johnson's place. Charley Stevens was killed on the next day. Gladewater is a regular station, at which all trains stop. Wilkins' Mill is a flag station, at which trains stop when a passenger wants to get on or off.

Mrs. Francis Stevens, the widow of the deceased, testified for the State that her husband was killed while plowing in his field in Gregg county, Texas, about noon on Monday, May 21, 1883. The witness, who at the time was in her garden, heard the report of the gun and immediately ran towards him. When she got near she saw his mule standing some little distance off, evidently frightened, and his body, perfectly still, lying between the plowed rows. She made two unsuccessful attempts to reach the body of her husband, and then with her children went rapidly to her father's house, about a mile distant and on the opposite side of the river. She reached her father's house about 1 o'clock. *En route* she gave the alarm to Mr. G. W. Collins.

During the winter before the killing the defendant and his father's family lived on the place of the deceased. There was no good feeling between either the deceased and the defendant, or the deceased and the defendant's father. Amon Stevens, charged also with this murder, was an uncle of the deceased, who came to the deceased's house from Michigan about six months before the killing. He, Amon Stevens, stayed about the house of the deceased, doing nothing until the 4th day of May, 1883, when the deceased made him and a woman whom he called his wife leave. Unfriendly feelings sprang up between the deceased and Amon Stevens some days before the latter left, and apparently increased in intensity until the latter and the woman were sent off. A few days before Amon Stevens left, the deceased received an anonymous letter, threatening his life and abusing him severely. The deceased showed this letter to Amon, and asked if he did not write it. Amon denied that he was the author of the letter, and said that he could not so disguise his handwriting. Deceased replied that he, Amon, had done the like before, and that he knew that the handwriting in the letter was his, Amon's. Amon stood trembling and restless without denying or saying anything further. Many hard words passed between the two before the deceased made Amon leave. Amon came back no more, but put up and stayed with the Bean family, about a half mile distant on the Gladewater road.

Charley Ford testified, for the State, that just before dark in the evening of Saturday, May 19, 1883, the defendant came to his house, about seven miles east of Longview, to borrow Jake Hirst's shot-gun, saying that his father had bought it. Witness let him have the gun. Defendant, who came to witness's house on foot, wanted to return that night, but the witness persuaded him to postpone his return until morning. Next morning he wanted to leave

before breakfast, but, an invitation being pressed, he remained to that meal. He left there, walking, about 8 or 9 o'clock, and on the next day, Monday, the witness heard of the killing of Charley Stevens. The defendant lived about twenty miles west from the witness. While at the witness's house the defendant shot off the gun. The witness gave him some ammunition in bottles. The bottles in court looked like those the witness gave him. The gun in court looked like the one defendant got from the witness. Witness could not, however, be positive as to the identity of these articles.

W. R. Rickets testified that, some ten days before the killing of Stevens, the defendant, being then in Longview, tried to borrow a shot-gun from him, for the purpose, as he averred, of shooting squirrels. Witness did not lend him a gun, and he asked witness where he could borrow one.

Bob Wood testified, for the State, that the defendant, his father, mother, brother and sister, at the time of the killing of Stevens, occupied a small fourteen by sixteen house with shed room attached, on his, the witness's, place, in Gregg county, Texas. A week or two before the killing, Amon Stevens, and the woman he called his wife, but who proved to be a Mrs. Lee, went into the house with the Bean family. About a week before the killing the defendant applied to the witness in Gladewater for the loan of a pistol. The witness refused. Defendant then said that he wanted the pistol for Amon Stevens. Witness still refused to let him have the pistol. Amon Stevens was then standing off, distant some forty feet. On being refused the pistol, the defendant joined Amon Stevens, and the two went off towards the Bean place. On the morning of the killing Amon Stevens tried to sell his horse to the witness, saying that he wanted to go to Longview, get him a place and sue Charley Stevens for a settlement.

The witness left the defendant hoeing cotton in his, the witness's, field, at about 9 o'clock on the morning of the killing. At about three minutes after 12 he came up to the witness's house, close by, and witness asked him how he was getting along at work. He replied that he had done but little that day, as he had been fixing a fence which had been damaged by a fallen tree. Amon Stevens was at that time standing in the door of the house occupied by the Bean family. At about half-past 12 the witness heard of the killing of Charley Stevens. Charley Stevens lived about a half mile distant from the witness.

James Moreland testified, for the State, that both the defendant and Amon Stevens were on bad and unfriendly terms with the de-

ceased. The defendant, a few days before the killing, told the witness that the deceased had not treated him right.

G. W. Collins testified, for the State, that he lived about three-quarters of a mile distant from the house of the deceased. When the gun fired, the witness had just sat down to dinner. About the time he finished, Mrs. Stevens came up screaming, and said that her husband had been shot. The witness went at once to the dead body of Charley Stevens. Within a few minutes several neighbors arrived, including Amon Stevens and the defendant. The defendant approached the body, looking very nervous, and pale blue in the face. While looking at the body, he said: "Mr. Collins, don't this beat hell?" Within a couple of minutes he left, going towards his house. Amon Stevens, who was likewise very nervous, proposed to measure tracks. He cut a stick, but was too nervous and shaky to make the measurement, and he peeled and cut his stick into fragments. Within a minute or two, he also left, going towards the Bean house, and the witness saw no more of him until after his arrest. The deceased and the defendant were not on good terms. Witness had heard each speak harshly of the other.

Joel Smith, a second cousin to the deceased's widow, testified for the State that he reached the body about two hours after death. The witness explained by diagram the topography of the country contiguous to the scene of the murder. The witness could find no plain tracks from the fence for a distance of a hundred and fifty yards. When, however, he reached a slough that ranged through the bottom to the river he found very plain and distinct tracks. These tracks, crossing a wet place, and proceeding through soft ground, went on to a point within a few steps of a barn that stood about thirty or forty yards across the road and opposite the Bean house, where the defendant and Amon Stevens lived. Witness trailed every track well from where the party crossed the wet place near the slough. This slough, the diagram shows, ran outside of the deceased's field, and nearly parallel with his fence. From the ambush to the slough, the witness could only see a heel track now and then, and where the undergrowth had been tramped on.

Hearing that the defendant claimed to have repaired Wood's fence on that morning, the witness rode around the field and inspected the fence. It had not been repaired that day, nor had it been recently disordered. The witness could find no evidence of recent work on the fence, nor could he find any indications anywhere along the line of the fence showing that anybody had been recently near it.

Justice of the Peace Dillingham testified, for the State, that he reached the body of the deceased about 2 o'clock on the day of the killing, and started at once to Gladewater. On his way he passed the Bean field and saw the defendant hoeing cotton. This was on the main road leading from the ferry to Gladewater. Defendant stopped work and looked at the witness. Witness halted and the defendant dropped his hoe and started to his house. When the witness started on, the defendant returned and resumed his work. A short time after this the witness had the defendant arrested.

Deputy Clerk May testified that he thought the gun in court was the same gun given to him by Sheriff Killingsworth a few days after the killing. It still bears the label the witness put on it when he received it from the sheriff. The sheriff was of the opinion that the gun in evidence was the same weapon he received from Judge McCord, and gave to the witness May.

Doctor J. C. Vernon testified, for the State, that he aided in tracking the assassin from the ambush at the fence to the slough. The tracks were easily followed by means of disordered undergrowth. The witness got a good measure of a heel track in the glade. Thence the witness went to the Bean place, and near the barn picked up a brown paper bag, the end of which had been torn off. The wadding found near the body was of paper similar in color and texture to the bag, as was also the wadding drawn out of the loaded barrel of the gun afterwards found by Judge McCord. While on the premises some one of the party went into the Bean house and brought out a pair of old boots, to the heel of which the witness applied the measure of the impression found in the glade. The impression and the heel of this boot corresponded exactly, both in size and in the turned-in appearance of each. A whitish blue mud, strongly resembling the mud in the slough and glade, still moist, adhered to the heel and instep of the boots.

John True was the next witness for the State. He testified that the defendant came to his house in Longview on the Thursday or Friday night before the killing, and asked for Hirst's shot-gun, saying that his father had traded for it. Witness told him that Hirst had gone fishing and would not be back until next day. He ate supper with witness, declined to stay all night, and left, saying he would call again. Witness saw him in Longview on the Saturday evening following. Longview is thirteen miles east of Gladewater, on the Texas & Pacific Railway. The gun exhibited is the Hirst gun, which for a time was in the possession of Charley Ford. Witness went to Stevens's house on the day after the killing and aided in the search.

He saw the tracks measured in the slough, and saw that measure applied to a pair of old boots taken from the Bean house. The measure fitted the boots exactly. The boots were old and mildewed on the tops, but showed signs of recent wearing. A bluish or whitish mud adhered to the heels and counters, and corresponded in appearance with the mud then on the witness's boots, which came from the slough and glade. Witness did not know to whom the old boots belonged.

Judge F. J. McCord was the last and most important witness examined on the trial. He testified that he was county attorney of Gregg county at the time of the killing of Charley Stevens. He went to the scene of the killing on the day after that event occurred. Stevens was killed in his field about twenty-five yards from the back fence and about two hundred yards distant from his house. He was shot from an ambush constructed at the corner and on the outside of his field. There were three different ambushes about this point, and about which the grass and undergrowth had been tramped down. The deceased was shot in the back, five buckshot entering his body just below the left shoulder blade. He lay in a pool of blood in a freshly plowed row. Witness went from the field to town, a distance of a half or three quarters of a mile, and found the defendant under arrest. He had been arrested the evening before, but had been released, and he was rearrested by order of the witness, issued when he first reached Gladewater on that day.

When witness reached Gladewater on his return from the field he asked the defendant what he had done with the gun used in the killing. Defendant first said that he knew nothing about it. Witness then told him that he had better tell — that it would be the best for him. He then said that the gun was behind the cross-fence in his father's cotton field; that he carried it there the previous night after his release; that he took it out of the old barn where he had put it on the Sunday evening before for Stevens; that he got the gun at Charley Ford's below Longview, and carried it to the Wilkins mill on the train where he got off on Sunday evening, and thence took it to the barn and left it for Stevens; that Stevens asked him to get the gun and leave it in the barn for him; that Stevens (Amon) told him that Charley Stevens had run over him long enough, and that he, Amon, wanted the gun to kill him, Charley Stevens; that on putting the gun in the barn he notified Amon Stevens where he would find it and the ammunition; that the gun was loaded with five bullets in each barrel, and that Amon shot

Charley with one of the barrels so loaded; that one barrel was then empty and the other was loaded with five bullets; that Amon asked him to borrow a pistol for him, and that he tried to do so but failed.

By direction of the defendant the witness went to the cotton patch, behind the cross-fence, and there found the gun, and a bottle each of powder and shot, which defendant said were with the gun. Those bottles resembled the bottles in evidence. Witness took the tracks from where the gun was found and followed them to within thirty or forty steps of the defendant's father's door. This space had been recently plowed and witness could not follow them any further. They went, however, towards the house and barn. On unloading the loaded barrel of the gun, witness found yellow paper wadding, powder and five buckshot. The other barrel had been recently discharged. Defendant told the witness that, after the gun fired, Amon Stevens came up to where he was from the direction of Charley Stevens's field, and said: "I have laid Charley out; keep mum." Defendant also told the witness that he was taking a tree from the fence on the south side when Amon Stevens came to him after the shooting. The south side of the fence he spoke of was some three or four hundred yards from where Charley Stevens was killed. The defendant was under arrest, and was unwarned when he made these statements to the witness.

The motion for new trial presented the questions discussed in the opinion.

*Taylor & Morrison* and *R. C. DeGraffenreid,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

Willson, Judge. I. It was not necessary to state in the indictment that the killing was "unlawfully" done. (*Thompson* v. *The State,* 36 Texas, 326.) Nor was it necessary to allege that the defendant was "a person of sound memory and discretion," nor that the deceased was "a reasonable creature in being." According to repeated decisions, the indictment in this case is in all particulars a good one. (*Ogden* v. *The State,* 15 Texas Ct. App., 454; *Moore* v. *The State,* Id., 1; *Drye* v. *The State,* 14 Texas Ct. App., 185; *Bohannon* v. *The State,* Id., 271; *Walker* v. *The State,* Id., 609; *Dwyer* v. *The State,* 12 Texas Ct. App., 535; *Peterson* v. *The State,* Id., 650, and authorities cited in said cases.)

II. There was no error in admitting in evidence the confession of the defendant. In connection with such confession he made a

statement of facts and circumstances which were found to be true, and which conduced to establish his guilt. By means of his statements, the gun with which the murder was committed was found at the place where he stated he had secreted it. (Code Crim. Proc., 750; *Buntain* v. *The State*, 15 Texas Ct. App., 485; *Weller* v. *The State*, 16 Texas Ct. App., 200.)

III. The verdict of the jury found the defendant "guilty of murder in the first degree as charged in the indictment," etc. At the request of the defendant the jury was polled; the verdict was read aloud to each juror, and each juror was asked if it was his verdict, and each distinctly answered that it was. Defendant proposed to ask the jurors if they intended to find the defendant guilty as a principal or as an accomplice. This was not allowed by the court. We perceive no error in the action of the court in polling the jury; but think it was in strict accordance with the statute. (Code Crim. Proc., art. 710.) It was expressly stated in the verdict that the defendant was found guilty of murder in the first degree, *as charged in the indictment*, and he was charged in the indictment as a principal and not as an accomplice. When the jurors answered that this was their verdict, it is to be presumed that they understood the meaning of the same. It was never intended, we think, in polling a jury, to permit the jurors to be interrogated further than to ask each of them the direct question, "Is that your verdict?" If he answer in the affirmative, his answer is conclusive, and further inquiry is not permissible. If the rule were otherwise, each juror might be subjected to a searching examination with a view to showing that he had been mistaken in the verdict he had rendered and solemnly announced to be his verdict. Such a practice would be unreasonable and detrimental to the ends of justice.

IV. Defendant's challenge to the array of jurors summoned as talesman was properly overruled, because it was not such a challenge as is warranted by the law. (Code Crim. Proc., art. 624.) It further appears that the district attorney proposed to excuse the persons summoned as jurors by the objectionable officer, but that the defendant declined to agree to this. It further appears that the defendant did not exhaust his peremptory challenges in the formation of the jury. He had six peremptory challenges remaining when the jury was completed. (*Woodard* v. *The State*, 9 Texas Ct. App., 412; *Cavitt* v. *The State*, 15 Texas Ct. App., 190; *Lum* v. *The State*, 11 Texas Ct. App., 483; *Loggins* v. *The State*, 12 Texas Ct. App., 65.)

V. An issue raised by the evidence in the case is whether, if guilty of the murder, the defendant was guilty as a *principal* or as

an *accomplice.* Being indicted as a *principal,* it is well settled that
if he was guilty as an *accomplice,* but not as a *principal,* he could
not be convicted legally, under this indictment. (*Truitt* v. *The
State,* 8 Texas Ct. App., 148; *McKeen* v. *The State,* 7 Texas Ct.
App., 631; *Sims* v. *The State,* 10 Texas Ct. App., 131.) It is ear-
nestly and ably insisted by counsel for defendant that the learned
judge who presided at the trial of this case failed to instruct the
jury fully and correctly upon this issue, but, on the contrary, mis-
directed them in his charge.

That our views with reference to this subject may be made more
intelligible, we will here insert those portions of the charge which
relate to the law of principals and accomplices. The jury are first
instructed as follows: "You are instructed that all persons are
principals who are guilty of acting together in the commission of
an offense; and principals, whether jointly or separately indicted,
may be legally prosecuted and convicted as such, provided the evi-
dence adduced against each one clearly and satisfactorily establishes
the guilt of each. Where an offense has been committed, the true
criterion for determining who are principals is, Did the parties act
together in the commission of the offense? Was the act committed
in pursuance of a common intent, and in pursuance of a previously
formed design, in which the minds of both united and concurred?
If so, then the law is that both are alike guilty, provided the offense
was actually committed during the existence and in execution of
the common design and intent of both, whether in point of fact
both were actually bodily present on the ground while the offense
actually took place, or not." This charge is a literal copy of the
charge given in *Scales* v. *The State,* 7 Texas Ct. App., 361, and also
in *Cook* v. *The State,* 14 Texas Ct. App., 96, and approved by this
court.

In the last cited case (*Cook* v. *The State*), the distinction between
principals and accomplices was very carefully considered, and more
thoroughly and definitely explained than in previous decisions. We
quote from the opinion in that case as follows: "We are of opinion
that the proper distinction between these two characters of offenders
is this: The acts constituting an accomplice are auxiliary only, all
of which may be, and are, performed by him, anterior and as in-
ducements to the crime about to be committed, whilst the principal
offender not only may perform some antecedent act in furtherance
of the commission of the crime, but, when it is actually committed,
*is doing his part of the work* assigned him in connection with the
plan and furtherance of the common purpose, whether he be present

where the main fact is to be accomplished, or not. When the offense is committed by the perpetration of different parts which constitute one entire whole, it is not necessary that the offenders should be in fact together at the perpetration of the offense, to render them liable as principals. In other words, an accomplice, under our statute, is one who has *completed his offense before the crime is actually committed*, and whose liability attaches after its commission by virtue of his previous acts in bringing it about through the agency of or in connection with third parties. The principal offender acts his part individually, in furtherance of and *during the consummation* of the crime." In the subsequent case of *O'Neal* v. *The State* (14 Texas Ct. App., 582), the foregoing distinction was cited and approved.

We must confess that, to our minds, the distinction between these two characters of offenders is often shadowy and indistinct. It is as clearly drawn in Cook's case as it is possible perhaps to draw it. The dividing line between the two is the commencement of the commission of the principal offense. If the parties *acted together* in the *commission* of the offense, they are principals. If they *agreed* to commit the offense together, but did not *act together* in its commission, the one who *actually* committed it is the principal, while the other, who was not present at the commission, and who was not in any way aiding in its commission, as by keeping watch, or by securing the safety or concealment of the principal, would be an accomplice. To constitute a *principal*, the offender must either be present where the crime is committed, or he must do some act during the time when the offense is being committed which connects him with the act of commission in some of the ways named in the statute. Where the acts committed occur *prior* to the commission of the principal offense, or *subsequent* thereto, and are independent of, and disconnected with, the *actual commission* of the principal offense, and no act is done by the party during the commission of the principal offense in aid thereof, such party is not a principal offender, but is an accomplice or an accessory according to the facts. We think the charge of the court which we have quoted, while not as full and explanatory of the distinction between principals and accomplices as is the opinion of Presiding Judge White in *Cook* v. *The State, supra*, is nevertheless substantially and practically sufficient, and it was not incumbent upon the court to instruct the jury more particularly and elaborately upon this question.

In a subsequent part of the charge, where the learned judge applies the law to the evidence, the jury are instructed as follows:

" If you believe from the evidence in this cause that, prior to the killing of the deceased Charles Stevens, it was agreed, understood and determined, by and between the defendant Ed. Bean and one Amon Stevens, that the latter should kill Charles Stevens, and that it was further agreed, understood and determined that the defendant Bean should procure a gun, with which Amon should kill the deceased Charles Stevens, and that, in pursuance of this design, the said defendant did procure a gun and place it in the hands of Amon Stevens, or place it where the said Amon was to and did get the said gun, and that, in pursuance of the agreement so formed between them,— defendant and said Amon,— the latter, in the county and State aforesaid, and prior to the 23d day of November, 1883, did, with express malice as defined to you hereinbefore, shoot with a gun and thereby kill the deceased Charles Stevens, and that this killing was done during the existence and in the execution of the common design of said Amon Stevens and defendant (if any such common design existed) that the said Amon should kill the deceased, then the defendant would be guilty of murder in the first degree, whether he were actually and bodily present at the time and place of the killing or not, and if you so believe you will so find." As we understand this charge, and as we understand the distinction between principals and accomplices, the state of facts presented in the charge would constitute the defendant an accomplice, and not a principal. The facts recited are precisely those which constitute an accomplice (Penal Code, art. 79), but do not constitute of themselves a principal offender, because they do not show that at the very time of the commission of the offense by Amon Stevens the defendant was in any way aiding, assisting or acting together with said Amon Stevens in the act of homicide, or in the furtherance of it. As stated in the charge, the act of the defendant was *completed* anterior to the killing, and was merely auxiliary thereto.

As a legal proposition, however, the charge is unquestionably correct. If the defendant was guilty of the acts recited, he was guilty of murder in the first degree, but he was guilty as an accomplice and not as a principal offender. This, the learned judge failed to explain to the jury, nor does he in any portion of his charge instruct the jury that, if they believe from the evidence that the defendant was an accomplice in the murder, and not a principal in it, they could not convict him under the indictment which charged him only as a principal. In this connection, the defendant requested the court to give the following special charge, viz.: " You are further charged that the defendant Ed. Bean being charged as a principal

offender, he cannot, under the Code of this State, be convicted as an accomplice." This was refused, and we think erroneously. Had the learned judge given this instruction, his otherwise admirable charge would have been unexceptionable. Without this addition, however, the issue as to whether or not the defendant was guilty as a principal or as an accomplice was not submitted to the jury, but on the contrary the jury were in effect told that, although the defendant was guilty as an accomplice, he still might be convicted properly under the indictment charging him as a principal. For this error the judgment of conviction must be reversed. It is true that this objection to the conviction is a technical one, and apparently without reason to support it. It is nevertheless a long and well established rule of the law, and without pausing now to examine and discuss its utility or wisdom, it is safe to say that, upon investigation and reflection, it will be found, like many other technicalities of the law, to be founded upon solid and sufficient reasons, and that it would be dangerous to the rights of the citizens of a free government to depart from or disregard it.

We will here again take occasion to suggest to district and county attorneys the very great utility of inserting several counts in the indictment in cases like this, where the evidence shows one or the other of two or more offenses growing out of the same transaction. In this case, the evidence presented three offenses, of either of which the jury might have found the defendant guilty under proper counts in the indictment, viz.: murder as a principal, accomplice to murder, and accessary to murder. From the evidence before us, the defendant, by his own confession, was guilty both as an accomplice and as an accessary, and yet under the indictment as it was framed he could not legally be convicted of either of these offenses. While the evidence is clear as to his guilt of these two offenses, it is not so clear that he was guilty as a principal, though, if the charge requested by his counsel and refused, which we have quoted, had been given, and the jury thus having had submitted to them the issue as to whether he was a principal or an accomplice, had found that he was a principal, we would not have disturbed the conviction.

Because of the error in the charge of the court, and the error in refusing to give the special charge requested, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered October 25, 1884.]